## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

JENNY RADER, on behalf of herself
and all others similarly situated,

    Plaintiff,

    v.                                              Civ. No. 20-559 JAP/JHR

SANDIA LABORATORY FEDERAL CREDIT UNION,

    Defendant.

### MEMORANDUM OPINION AND ORDER

On August 31, 2020, Sandia Laboratory Federal Credit Union ("Defendant") moved to dismiss Jenny Radar's ("Plaintiff's") CLASS ACTION COMPLAINT (Doc. 1) ("Complaint").[1] At first blush, the Complaint appears to allege garden-variety breach of contract claims, a few extra-contractual claims, and a federal consumer protection law violation against a credit union by one of its members. But below the surface, there is an ongoing national battle between certain interest groups against federal credit unions, with consumers attacking overdraft fee disclosures via attempted class action lawsuits. Federal credit unions are now being forced to defend membership agreements and overdraft fee disclosures from technical accounting arguments, even though the consumers incurring the penalties literally appear to be spending more money than they actually have. Although most federal credit unions will undoubtedly respond with revised membership agreements and opt-in contracts to eliminate any ambiguities, this Motion is

---

[1] *See* DEFENDANT SANDIA LABORATORY FEDERAL CREDIT UNION'S MOTION TO DISMISS PLAINTIFF JENNY RADER'S COMPLAINT (Doc. 15); MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SANDIA LABORATORY FEDERAL CREDIT UNION'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT (Doc. 17) ("Motion"). The Motion is fully briefed. *See* PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (Doc. 23) ("Response"); REPLY IN SUPPORT OF DEFENDANT SANDIA LABORATORY FEDERAL CREDIT UNION'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT (Doc. 24) ("Reply").

Defendant's attempt to neutralize an attack on its own overdraft practices.  The Court will grant Defendant's Motion in its entirety.

## I.   BACKGROUND

At the outset, the Court includes some general information to help the reader understand Plaintiff's arguments.  Essentially, Plaintiff's claims turn on which accounting method Defendant promised to use when it assessed overdraft fees on her checking account.  Financial institutions primarily use two approaches to calculate an account holder's checking account balance: the ledger balance method and the available balance method.  As described by the Consumer Financial Protection Bureau ("CFPB"),

> [a] ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared.

CFPB, Winter 2015 Supervisory Highlights, Section 2.3; *see* Compl. ¶ 25 n.14 (same).

## II.   FACTUAL BACKGROUND[2]

Defendant is a federal credit union.  Compl. ¶ 8.  Defendant requires its members to sign a Membership and Account Agreement ("Membership Agreement").  *Id*. ¶ 18.  The Membership Agreement incorporates Defendant's Funds Availability Policy Disclosure ("FAPD"), which explains a member's ability to withdraw funds from transaction accounts.  *Id*., Ex. A § 12. Additionally, Defendant offers overdraft protection to its members via a form entitled "What You

---

[2] The Court accepts as true the factual allegations in the Complaint for the purposes of deciding a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court does not, however, accept as true any legal conclusions within the FAC.  *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Need to Know About Overdrafts, Overdraft Fees and Courtesy Pay ("Opt-In Contract"). *Id.* ¶ 19;

*see also id.*, Ex. B.  The parties agree that these instruments govern Plaintiff's claims. [3]

The Membership Agreement, in relevant part, states:

**12. TRANSACTION LIMITATIONS**
**a. Withdrawal Restrictions**. We will pay checks or drafts, permit withdrawals, and make transfers from available funds in your account. The availability of funds in your account may be delayed as described in our Funds Availability Policy Disclosure. We may also pay checks or drafts, permit withdrawals, and make transfers from your account from insufficient available funds if you have established an overdraft protection plan or, if you do not have such a plan with us, in accordance with our overdraft payment policy.

**14. OVERDRAFTS**
**a. Payment of Overdrafts.** If, on any day, the available funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, transaction . . . we may return the item or pay it, as described below. The Credit Union's determination of an insufficient available account balance may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do not have to notify you if your account does not have sufficient available funds[.]

If we offer standard overdraft services, this service allows us to authorize payment for the following types of transactions regardless of whether your share or deposit account has sufficient funds . . . For ATM and one-time debit card transactions, you must affirmatively consent to such coverage. Without your consent, the Credit Union may not authorize and pay an ATM or one-time debit card transaction that will result in insufficient funds in your account. If you have established a service linking your share or deposit account with other individual or joint accounts, you authorize us to transfer funds from another account of yours to cover an insufficient item  . . . Services and fees for these transactions are shown in the document the Credit Union uses to capture your affirmative consent and the Schedule of Fees and Charges.

Except as otherwise agreed in writing, if we exercise our right to use our discretion to pay such items that result in an insufficiency of funds in your account, we do not

---

[3] Plaintiff attached copies of the Membership Agreement and the Opt-In Contract to her Complaint, both of which are central to her claims.  Additionally, the Membership Agreement incorporates Defendant's FAPD.  Neither party disputes the authenticity of these documents.  Therefore, the Court may consider them without converting Defendant's Motion to a motion for summary judgment.  *See Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir. 2005) ("[A] document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute.").

agree to pay them in the future and may discontinue coverage at any time without notice. If we pay these items or impose a fee that results in insufficient funds in your account, you agree to pay the insufficient amount, including the fee assessed by us, in accordance with our standard overdraft services or any other service you may have authorized with us, or if you do not have such protections with us, in accordance with any overdraft payment policy we have, as applicable.

Compl., Ex. A §§ 12, 14.

The Opt-In Contract specifies that "an overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." *Id*., Ex. B. Lastly, the FAPD explains a member's "ability to withdraw funds" and "only applies to the availability of funds in transaction accounts." Doc. 16 at 5.

In accordance with the foregoing, Defendant assessed multiple overdraft fees on Plaintiff's account for various one-time debit card purchases, including six penalties on January 21, 2019, two on February 11, 2019, three on February 12, 2019, three on March 30, 2019, and three more on June 1, 2020. Compl. ¶¶ 28, 30–32. Plaintiff alleges that Defendant violated the Membership Agreement and Opt-In Contract when it imposed these fees because her ledger balance reflected an amount sufficient to cover the transactions. *Id*. Specifically, Plaintiff asserts that by pegging overdraft fees to her available balance, even though Defendant promised to penalize her only when her ledger balance could not cover a transaction, Defendant breached (1) the Opt-In Contract (Count I), (2) the Membership Agreement (Count II), and (3) the implied covenant of good faith and fair dealing (Count III). *Id*., *passim*. Plaintiff further alleges that this practice unjustly enriched Defendant (Count IV). *Id*. ¶¶ 70–73. Lastly, Plaintiff argues that Defendant violated Regulation E, 12 C.F.R. §§ 1005, *et seq*., implemented under the Electronic Fund Transfers Act ("EFTA"), 15 U.S.C. §§ 1693, *et seq*., when Defendant failed to provide a valid description of its overdraft program, i.e., that it uses the available balance method rather than the ledger balance method to assess penalties (Count V). *Id*. ¶¶ 74–78.

4

## III.   LEGAL STANDARD

A Rule 12(b)(6) motion "tests the sufficiency of the allegations within the four corners of the complaint." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).  In considering a Rule 12(b)(6) motion, courts must "accept as true all well-pleaded factual allegations in a complaint and view [those] allegations in the light most favorable to the [non-moving party]." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).  The allegations must "state a claim to relief that is plausible on its face." *Id.* (quoting *Ridge at Red Hawk L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).  "The claim is plausible only if it contains sufficient factual allegations to allow the court to reasonably infer liability." *Moya v. Garcia*, 895 F.3d 1229, 1232 (10th Cir. 2018) (citing *Iqbal*, 556 U.S. 662, 678 (2009)).  The term "plausible" does not mean "likely to be true." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  The factual allegations must "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555—i.e., "that discovery will reveal evidence to support the plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).  A mere "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## IV.   ANALYSIS

### A.  Counts I-II

Counts I and II are simple breach of contract claims.  In Count I, Plaintiff alleges that Defendant breached the express terms of the Opt-In Contract when it assessed overdraft fees on Plaintiff's checking account even though her ledger balance was sufficient to cover the transactions

at issue.   Count II advances the same theory but as applied to the Membership Agreement. Defendant maintains that both Counts fail to state a claim because the two agreements, read in tandem, unambiguously convey that Defendant applies the available balance method to assess overdraft fees.   The Court agrees.

As a threshold matter, the Court will read the Membership Agreement and Opt-In Contract as a whole.   In a misguided tactic, Plaintiff completely divorces the Membership Agreement from the Opt-In Contract, reading each document in isolation when advancing her arguments.   Indeed, Plaintiff does not even attempt to convince the Court that these instruments should be separated (she just assumes that they should be), nor does she include counter-arguments to address a scenario where the agreements are read together.   Rather, Plaintiff merely states in a footnote, perfunctorily, that she "still states a claim for relief even if the Opt-In Contract and Membership Agreement" are read collectively.   Resp. 11 n.8.

Unfortunately for Plaintiff, New Mexico law dictates that the Membership Agreement and the Opt-In Contract should be read as a whole: the Membership Agreement repeatedly references the opt-in requirement for overdraft protection for one-time debit transactions (i.e., the document used to receive affirmative consent) and both instruments concern the same subject matter (overdrafts).   *See Master Builders, Inc. v. Cabbell*, 622 P.2d 276, 279 (N.M. Ct. App. 1980) (recognizing a general rule of contract construction allowing two documents to be properly construed together when one document refers to the other).

To be sure, the "Overdrafts" section of the Membership Agreement states:

> If we offer *standard overdraft services* . . . [f]or ATM and one-time debit card transactions, you must *affirmatively consent to such coverage*. Without your consent, the Credit Union may not authorize and pay an ATM or one-time debit card transaction that will result in insufficient funds in your account . . . Services and fees for these transactions are shown in the *document the Credit Union uses to capture your affirmative consent and the Schedule of Fees and Charges.*

6

Compl. Ex. A § 14 (emphases added).   In turn, Defendant employs the Opt-In Contract (1) to explain its "standard overdraft practices," (2) to disclose the fees it charges to pay an overdraft, and (3) to capture a consumer's *affirmative consent* to the policy.   *See* Compl., Ex. B.

Additionally, Regulation E requires that Defendant segregate the Opt-In Contract from the Membership Agreement, thus, the instruments were divorced in accordance with federal law, *see* 12 C.F.R. § 1005.17(b)(1)(i) ("Provide[] the consumer with a notice . . . segregated from all other information, describing the institution's overdraft service"), and not because the parties intended them to stand alone.   *See Master Builders*, 622 P.2d at 279 ("When as here, two documents are executed by the same parties and concern part of the same subject matter, although not involving the same transaction, the issue of whether they should be treated as a single contract is determined by considering the intent of the parties manifested at the time of contracting and viewed in light of the surrounding circumstances.").[4]   Therefore, the Court will construe these documents together.[5] However, instead of turning to the Opt-In Contract first, the Court will begin with the logical starting point, the Membership Agreement.

---

[4] The parties are unable to stipulate to whether the Membership Agreement and Opt-In Contract were executed at the same time.   *See* JOINT STATUS REPORT REGARDING MOTION TO DISMISS (Doc. 33) ("Sandia's records do not show the date Plaintiff executed the 'What You Need to Know About Overdrafts, Overdraft Fees and Courtesy Pay' document (Complaint, Ex. B). Therefore, and for purposes of the pending Motion to Dismiss, Sandia cannot confirm whether the form was executed at the same time Plaintiff received the Sandia Member Agreement (Complaint, Ex. A).").

[5] In addition to state law, several other federal courts have found that the agreements are inextricably linked such that they must be construed together.   *See Domann v. Summit Credit Union*, 2018 WL 4374076, at *5 (W.D. Wis. Sept. 13, 2018) ("there would be no need for the overdraft coverage provided for in the Opt In Agreement were it not for the existence of a corresponding account established through the Account Agreement"); *Walbridge v. Ne. Credit Union*, 299 F. Supp. 3d 338, 344 (D.N.H. 2018) ("Although the Agreements are separate, they are arguably linked with respect to an account holder's overdraft protection."); *Smith v. Bank of Hawaii*, 2017 WL 3597522, at *6 (D. Haw. Apr. 13, 2017) ("[T]his reading is consistent with common sense. The Account Agreement forms the relationship between BOH and its customers, and the Opt-In Agreement applies to that very account. Simply stated, a customer cannot "opt-in" to overdraft protection for an account that does not exist.").

7

Defendant first relies on *Page v. Alliant Credit Union*, 2020 WL 5076690 (N.D. Ill. Aug. 26, 2020) to establish that the Membership Agreement unambiguously informed Plaintiff that the available balance method applied to overdrafts.  The membership agreement considered by the court in *Page* court had the following provisions:

> [7a] Withdrawal Restrictions. We permit withdrawals only if your account has *sufficient available funds* to cover the full amount of the withdrawal or you have an established overdraft protection plan. Checks or other transfer payment orders which are drawn against insufficient funds may be subject to a [sic] service charges as set forth in the Fee Schedule. If there are sufficient funds to cover some, but not all of your withdrawal, we may allow those withdrawals for which there are sufficient funds in any order at our discretion. We may refuse to allow a withdrawal in some situations, and will advise you accordingly[.]

> [7b] Overdraft Liability. If on any day, the funds in your savings account are not sufficient to cover checks, fees or other items posted to your account, those amounts will be handled in accordance with our overdraft procedures or by one of the overdraft protection plans outlined below. . . .  Whether the item is paid or returned, your account may be subject to a charge as set forth in the Fee Schedule[.]

*Page*, 2020 WL 5076690, at *1 (emphasis added).  In granting the credit union's motion to dismiss, the *Page* court concluded that the above language unambiguously conveyed to the consumer that overdraft fees would be assessed on a consumer's available balance and not the ledger balance. *Id*. at *3.  The court explained that the plaintiff's "reading of the agreement that all of her funds should be accessible renders the term 'available' meaningless." *Id*.  The court explained:

> [R]eading § 7a as a whole, the term 'sufficient available funds' is followed by language discussing service charges outlined in the fee schedule if the member does not have overdraft protection. Section 8b of the Membership Agreement, the overdraft protection section, explains: 'If the amount of the item presented for payment exceeds the total available overdraft sources, the item will be returned as non-sufficient funds (NSF) and you will be charged applicable fees.' Read in tandem, these sections of the Membership Agreement spell out that not all funds are immediately available for use or withdrawal.

*Id*. at *4.

8

Defendant next relies on *Domann v. Summit Credit Union*, 2018 WL 4374076 (W.D. Wis. Sept. 13, 2018). Continuing a common theme, the *Domann* plaintiff asserted identical arguments as Plaintiff does here. *Id*. at \*2–3. And as here, the *Domann* court construed the credit union's membership agreement and opt-in contract together. *Id*. at \*5. The membership agreement at issue included the following provisions:

> Withdrawal Restrictions. We will pay checks or drafts, permit withdrawals, and make transfers from *available* funds in your account. The *availability* of funds in your account may be delayed as described in our Funds Availability Policy Disclosure. We may also pay checks or drafts, permit withdrawals, and make transfers from your account from insufficient *available* funds if you have established an overdraft protection plan or, if you do not have such a plan with us, according to our overdraft payment policy.

> Payment of Overdrafts. If, on any day, the *available* funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it, as described below. The Credit Union's determination of an insufficient *available account balance* may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do not have to notify you if your account does not have sufficient *available* funds in order to pay an item. Your account may be subject to a charge for each item regardless of whether we pay or return the item.

*Id.* at \*6 (emphases in original). The *Domann* court also considered the "Fund Transfers" section of the membership agreement, which stated that the credit union is "not obligated to execute any order to transfer funds out of your account if the amount of the requested transfer plus applicable fees exceeds the *available funds* in your account." *Id*. (emphasis in original). Lastly, the *Domann* court reviewed the credit union's Fund Availability Policy Disclosure:

> Funds may not be available until the second business day after the day of your deposit. However, the first $200.00 of your deposit will be available on the first business day after the day of your deposit. If we are not going to make all of the funds from your deposit available on the same business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available.

*Id*.  The *Domann* court concluded that, when the provisions are "read in context and as a whole, the only reasonable way to interpret the contract is that the credit union assesses overdrafts based on a member's available balance, rather than the ledger balance."  *Id*. (adopting the credit union's argument).  The court continued that, "although it is true that the Account Agreement does not have a glossary or expressly define the term 'available account balance' or 'available funds,' the Funds Availability Policy makes clear the word 'available' has a specific meaning and that funds 'available' in a customer's account may be a subset of the dollars shown on the ledger balance." *Id*.

Lastly, Defendant relies on *Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1 (D.D.C. 2016), in which the plaintiff made the same or similar arguments and the court had the same issue before it: Did the credit union violate its agreements by assessing overdraft fees when a consumer overdrew the available balance.  The court's summary of the account agreement at issue is as follows:

> The debit transactions at the center of this case are governed by the account agreement's provision on "Electronic Funds Transfers."  In a section partially titled "Available Balances to Make Transactions," the provision provides: "You authorize us to charge the account you designate for each Transaction and you will have sufficient collected funds *available* in the account for that purpose." If, on the other hand, "any Transaction you request exceeds the *balance of available collected funds* in the account either at the time you request the transaction or at any later time that your account is scheduled to be debited, we need not make such Transaction and will not be liable to you if we don't." Finally, if the Credit Union elects to pay the transaction anyway, "an overdraft will be created."

*Id*. at *10-11 (emphases in original) (internal citations omitted).  The *Chamber*s court determined that "these provisions unambiguously link overdrafts to the available balance."  *Id.*  That is, the language offered "no support for [the plaintiff's] theory that the Credit Union promised to impose overdraft fees only on debit transactions that overdrew her [ledger] balance."  *Id*.

10

The *Chambers* court further reinforced this conclusion by relying on the credit union's funds availability disclosure, which described "[the customer's] ability to withdraw funds [from transaction accounts]," and made clear "that not every dollar in a customer's account is immediately 'available' for withdrawal." *Id.* (internal quotations omitted). Therefore the court concluded that, "[w]hen the account agreement refers to 'available' funds, it must be referring to a subset of funds unencumbered by such restrictions—exactly the type of restrictions that can create a divergence between the actual and available balances in the first place." *Id.* (citing CFPB, Supervisory Highlights at 8 ("An available balance also reflects holds on deposits that have not yet cleared.")).

For her part, Plaintiff relies on three cases to establish that the ledger method governs (or that an ambiguity exists), all of which are distinguishable from the instant agreements. Plaintiff's first case, *Walbridge v. Ne. Credit Union*, 299 F. Supp. 3d 338 (D.N.H. 2018), can be easily disregarded by this Court. There, the agreements at issue did not contain the terms "available funds" or "sufficient available funds" but rather only "insufficient funds," "nonsufficient funds," and "enough money." *Id.* at 344; *see also id.* at 345 ("In this case, the Opt-In Agreement does not include the examples and explanations that were provided in *Chambers* nor are there repeated references in the Account Agreement that link overdrafts to *available balances* or clearly show the parties' intent that the terms used meant *available balance*."). Thus, because the modifying term "available" was not part of the contracts at issue as it is here, *Walbridge* is distinguishable.

Plaintiff's second case, *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848 (W.D. Mich. 2016), suffers from the same omission. There, the agreement simply stated that the credit union would "charge an overdraft fee when the account does not contain sufficient funds." *Id.* at 854. Unsurprising, the modifying term "available" was absent. *See id.* at 855 ("the account

agreement at issue in *Chambers* contained several references to 'available' funds in the account, which, the court concluded, linked overdrafts to the account's available balance . . . . In the instant case, Advia fails to point to any similar provisions in the Member Account Agreement suggesting that the available balance determines the overdraft status of an account.").

Plaintiff's last case, *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228 (11th Cir. 2019), also does not feature the qualifying term "available" in relation to "funds."  The membership agreement in *Tims* simply stated "that an overdraft occurs '[i]f an item is presented without sufficient funds in your account to pay it' or 'if funds are not available to pay all of the items.'"  *Id*. at 1238.  Again, "available" did not modify "funds" in the same way that it does in Defendant's Membership Agreement.  *See id*. at 1241. (finding the proximity of the word "available" to the word "insufficient" failed to communicate which balance method applied).  Tellingly, the credit union in *Tims* argued, among other things, that in its account agreement the word "sufficient" was synonymous with "available."  *Id*. at 1239.  *Tims* is distinguishable.

Here, like *Page*, *Domann*, and *Chambers*, the Membership Agreement features the modifying term "available" in relation to "funds," which sufficiently links the available balance method to overdraft fees. To illustrate, § 12a, entitled "Withdrawal Restrictions," which falls under the "Transaction Limitations" Section of the Membership Agreement, explains that Defendant will "pay checks or drafts, permit withdrawals, and make transfers from *available funds[.]*"  Comp., Ex. A § 12 (emphasis added).  However, "[t]he *availability of funds* in your account may be delayed as described in our Funds Availability Policy Disclosure."  *Id*. (emphasis added).  The FAPD in turn "describes [Plaintiff's] ability to withdraw funds" and "only applies to the *availability of funds* in transaction accounts."  Doc. 16 at 5 (emphasis added).  Now turning back to § 12a, Defendant further explains that it "may also pay checks or drafts, permit withdrawals,

and make transfers from your account from *insufficient available funds* if you have established an overdraft protection plan or, if you do not have such a plan with us, in accordance with our overdraft payment policy." Compl., Ex. A § 12 (emphasis added).

Moving on to the provision of the Membership Agreement entitled "Overdrafts," § 14a, "Payment of Overdrafts," informs Plaintiff that, "[if] on any day, the *available funds* in your share or deposit account are not sufficient to pay the full amount of a check, draft, *transaction*, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it, as described below." *Id*. § 14 (emphases added).   Section 14a continues, "[t]he Credit Union's determination of an *insufficient available account* balance may be made at any time . . . [w]e do not have to notify you if your account does not have *sufficient available funds* in order to pay an item. *Your account may be subject to a charge for each item regardless of whether we pay or return the item*." *Id*. (emphases added).  At this point, it is plain to the reader that the available balance method applies.

Nonetheless, Plaintiff argues that stray uses of "sufficient funds" changes this. Specifically, Plaintiff argues that the following language conveys that the ledger balance applies: (1) "If we offer standard overdraft services, this service allows us to authorize payment for the following types of transactions regardless of whether your share or deposit account has sufficient funds;" (2) "If we pay these items or impose a fee that results in insufficient funds in your account, you agree to pay the insufficient amount, including the fee assessed by us; " and (3) "[I]f we . . . pay such items that result in an insufficiency of funds, we do not agree to pay them in the future . . . ." Resp. 12.  The Court disagrees.  This language appears in the second and third paragraphs of § 14a, after it has already been explained in § 12a, the first paragraph of § 14a, and the FAPD that the available balance method applies.  By the time Plaintiff reaches the second and third paragraphs

of § 14a, she already knows that she cannot break the bank by making numerous purchases throughout the day but nonetheless avoid overdraft fees because those transactions have not posted, i.e., even though her ledger balance has remained unchanged.  Furthermore, the Court notes that Plaintiff does not even acknowledge that the relevant Membership Agreement provisions, i.e., §§ 12 and 14, begin by using the modifying term "available."  Rather, Plaintiff waded through several dispositive paragraphs to reach her cherry-picked sentences, simply claiming "available" appears "elsewhere" in the Membership Agreement.  *See* Resp.  The Court will dismiss Count II with prejudice because "available" appears front and center, unambiguously conveying that the available balance method applies.

This also holds true for the Opt-In Contract.  The Opt-In Contract states that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  As just explained above, the Membership Agreement and FAPD clearly explain how Defendant determines when a consumer has enough money in the consumer's account to cover a transaction.  Because the Opt-In Contract must be read in tandem with the Membership Agreement, Plaintiff's claim cannot survive.  The Court will dismiss Count I with prejudice

## B.  Count III

In Count III, Plaintiff alleges that Defendant breached the implied covenant of good faith and faith dealing.  "New Mexico courts have held that every contract imposes a duty of good faith and fair dealing on the parties with respect to the performance and enforcement of the terms of the contract." *Sanders v. FedEx Ground Package Sys., Inc.*, 188 P.3d 1200, 1203 (N.M. 2008).  "The implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement."  *Id*. (internal quotations omitted).  A party breaches the implied covenant when it "wrongfully and intentionally use[s] the

contract to the detriment of the other party." *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 82 (N.M. 1993) holding limited on other grounds by *Davis v. Devon Energy Corp.*, 218 P.3d 75, 85–86 (N.M. 2009).

Defendant argues that this claim should be dismissed for three reasons: (1) the Membership Agreement and Opt-In Contract unambiguously convey that the available balance method applies to overdraft fees, (2) Plaintiff failed to plead the element of bad faith, and (3) it is preempted by federal law. Mot. 16. Plaintiff argues the inverse, that is, her claim survives because the contracts misrepresent which accounting method applies to overdraft fees. Resp. 18–19.

The Court agrees with Defendant, this claim must be dismissed because the Membership Agreement and Opt-In Contract adequately informed Plaintiff that the available balance method applies to overdraft fees, i.e., Plaintiff has not shown that Defendant breached either instrument or otherwise deprived her of their benefits. Simply put, this claim fails because Plaintiff expressly agreed to incur overdraft fees when her available balance was insufficient to cover a one-time debit transaction. *See Melnick v. State Farm Mut. Auto. Ins. Co.*, 749 P.2d 1105, 1110 (N.M. 1988) ("We align also with those courts that have refused to apply an implied covenant of good faith and fair dealing to override express provisions addressed by the terms of an integrated, written contract"). The Court will dismiss Count III with prejudice.

### C. Count IV

In Count IV, Plaintiff asserts that Defendant was unjustly enriched when it assessed overdraft fees on her checking account. Compl. ¶ 71. "To prevail on such a claim, [Plaintiff] must show that: (1) [Defendant] has been knowingly benefitted at [her] expense (2) in a manner such that allowance of the [Defendant] to retain the benefit would be unjust." *Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695, 698 (N.M. Ct. App. 2002). However, the Tenth Circuit has held that, under

New Mexico law, quasi-contractual remedies "are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue." *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1117 (10th Cir. 2005). "Accordingly, where there is a contractual relationship between the parties, claims for unjust enrichment or quantum meruit are barred." *Id.*

Here, Plaintiff's allegations do not make it plausible that there was no enforceable contract regulating the parties' relationship. To be sure, Plaintiff does not even allege in the alternative that the Membership agreement and Opt-In Contract are unenforceable. *See, e.g., Strobel v. Rusch*, 431 F. Supp. 3d 1315, 1330 (D.N.M. 2020) (plaintiff argued unenforceable contract in the alternative); *Oliver v. Meow Wolf, Inc.*, 2020 WL 6939875, at *11 (D.N.M. Nov. 25, 2020) ("Defendants have vigorously disputed the existence of an enforceable contract that regulates the parties' relations, and if they prevail on this point, there will be no contractual bar to Plaintiff's unjust enrichment claims."). Rather, Plaintiff cursorily incorporates the allegations that support her breach of contract claims, asserting that "Defendant unjustly received millions in overdraft fees," which is a claim clearly grounded in the parties' contractual relationship. Compl. ¶¶ 70–71. Moreover, there is no dispute (or any allegations to the contrary) that the parties are in privity of contract, thus Plaintiff's claim for equitable relief is not only implausible but it is barred. The Court will dismiss Count IV with prejudice.

### D.  Count V

Here, Plaintiff alleges that the Opt-In Contract violates Regulation E's "Opt-In Rule" because the Opt-In Contract does not accurately reflect Defendant's overdraft policy. Compl. ¶ 76. The "Opt-In Rule" states,

> a financial institution holding a consumer's account shall not assess a fee or charge
> on a consumer's account for paying an ATM or one-time debit card transaction

pursuant to the institution's overdraft service, unless the institution: (i) *Provides the consumer with a notice* . . . segregated from all other information, describing the institution's overdraft service; (ii) Provides a reasonable opportunity for the consumer to affirmatively consent . . . [and]; (iii) Obtains the consumer's affirmative consent . . . .

12 C.F.R. § 1005.17(b)(1) (emphasis added); *see also id*. § 1005.17(d)(1) (requiring a "brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed"). The required notice "shall be substantially similar to Model Form A–9 . . . include all applicable items in this paragraph, and may not contain any information not specified in or otherwise permitted by this paragraph." *Id*. § 1005.17(d). Model Form A–9 states that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." *Id*. § 1005, App. A. Defendant's Opt-In Contract mirrors Model Form A–9 verbatim.

Defendant advances three reasons why Count V fails to plausibly state a violation of Regulation E's Opt-In Rule. First, Defendant argues that the EFTA's one-year statute of limitations bars this claim because Plaintiff incurred the first overdraft fee eighteen months prior to commencement of this action. Mot. 17–19. Second, Defendant maintains that Count V is tethered to Plaintiff's breach of contract claims and, therefore, must fail as a matter of law if the Court finds that the Membership Agreement and Opt-In Contract unambiguously convey that the "available" balance method applies to overdraft fees. *Id*. at 19. Third, Defendant asserts that the EFTA's safe harbor provision insulates it from liability. *Id*. at 20–22.

As an initial matter, the Court agrees with Defendant that because it has already determined that the Opt-In Contract and Membership Agreement, collectively, informed Plaintiff that the available balance method applies to overdraft fees, this claim must also be dismissed. *See Chambers*, 222 F. Supp. 3d at 15–16 (theory that opt-in agreement failed to provide sufficient

17

notice in violation of Regulation E dismissed for same reasons as breach of contract claim).  But the Court will nonetheless address Defendant's other two arguments in the alternative.

        *1) Limitations Period*

Claims brought under the EFTA must be brought "within one year from the date of the occurrence of the violation."  15 U.S.C. § 1693m(g).  Plaintiff alleges that Defendant assessed overdraft fees in January 2019, February 2019, March 2019, and June 2020.  Compl. ¶¶ 20, 30–32.[6]  Plaintiff filed suit in June 2020, approximately eighteen months after the first overdraft penalty.  Thus, unless the limitations period is tolled, Plaintiff's EFTA claim is barred.

Defendant maintains that the only applicable tolling devices, the discovery doctrine and the continuing violation doctrine, do not apply to Regulation E claims.  Mot. 17.  To support this proposition, Defendant relies on district court cases from Utah, Wisconsin, and Texas.  *Id.* (relying on *Tilley v. Mountain Am. Fed. Credit Union*, 2018 WL 4600655 (D. Utah Sept. 25, 2018); *Domann*, 2018 WL 4374076; and *Whittington v. Mobiloil Fed. Credit Union*, 2017 WL 6988193 (E.D. Tex. Sept. 14, 2017).  For her part, Plaintiff relies on *Smith v. Bank of Hawaii*, 2018 WL 1662107, at *5 (D. Haw. Apr. 5, 2018) to establish that a Regulation E violation occurs every time an overdraft fee is assessed against a consumer's checking account.  Resp. 22–23.  The Court concludes Plaintiff's claim is time barred.

In *Smith*, the court held that every overdraft charge triggered its own limitations period because Regulation E "focuses not only on the requirements for a consumer's opt-in, but it also

---

[6] Defendant argues that the June 2020 fees cannot be used by Plaintiff to overcome the EFTA time bar.  First, Defendant argues that it refunded those fees, therefore Plaintiff does not have standing to rely on them.  Mot. 18. Second, Defendant argues that the June 2020 fees were imposed on reoccurring transfers and not on one-time debit card transactions, which is an element of Plaintiff's Regulation E claim.  The Court does not need to address either argument because the alleged January 2020 fees are not dispositive to the outcome of the case.

expressly prohibits 'any fee or charge on the consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service' unless proper disclosure is made." *Smith*, 2018 WL 1662107, at *5 (quoting 12 C.F.R. § 1005.17(c)(2)).  Accordingly, the court determined that, when a "a bank assesses overdraft fees or charges, it violates the express language of Regulation E every time it imposes a fee or charge." *Id*.  Because the *Smith* plaintiff "asserted an improper overdraft fee was charged within one year of the day he filed his Complaint, [the credit union] [was] not entitled to summary judgment on Smith's EFTA claim."  But the court noted that "[c]laims based on overdraft fees imposed outside the one-year limit, however, are barred." *Id*.

Approximately five months later, *Smith*'s reasoning was soundly rejected by *Domann*, which found *Smith* "not persuasive" because "[a]s a general rule, a statute of limitations begins to run when the plaintiff has 'a complete and present cause of action' upon which the plaintiff 'can file suit and obtain relief.'" *Domann*, 2018 WL 4374076, at *10 (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 195, 201 (1997)).  The *Domann* plaintiff "allege[d] that [the credit union] violated the EFTA by failing to comply with [the Opt-In Rule], including failing to provide its customers with a valid description of the overdraft program." *Id*.  The court concluded that the plaintiff's "alleged wrongful conduct [was] based on . . . the failure of [the credit union's] opt-in contract to explain that [the credit union] would use the 'available' balance in the account rather than the 'ledger' balance when assessing overdrafts."  For that reason, there was "no basis to find that a new cause of action accrued with each new overdraft fee." *Id*.  Indeed, the court observed that "most district courts that have considered the EFTA statute of limitations have concluded that the limitation period is triggered when a financial institution makes a first unauthorized transfer or charges an overdraft fee,

rejecting the application of a 'continuing violation' theory." *Id*. at *9 (citing cases).[7]

Shortly after *Domann*, a Tenth Circuit case, *Tilley v. Mountain Am. Fed. Credit Union*, 2018 WL 4600655 (D. Utah Sept. 25, 2018), likewise addressed the EFTA's time bar when a complaint was filed nine months after the one-year period had run, specifically focusing on the discovery rule.[8]  In *Tilley*, the plaintiff alleged that the opt-in notice "failed to inform him that [the credit union] used the available balance method to determine when an overdraft occurs rather than the ledger balance method."  2018 WL 4374076, at *2.  The court concluded that the discovery rule did not apply because the plaintiff was aware of or had reason to know (1) "the content of the opt-in notice that was provided to him when he agreed to participate in the overdraft service;" (2) "that the ledger balance of his checking account was $49.31 when he used his debit card to make an $11.86 purchase on January 10, 2016;" and (3) that the credit union "assessed a $20 overdraft fee based upon this purchase."  *Id*. at *4.  Put simply, the plaintiff "knew or had reason to know of his injury" and "he knew or had reason to know of the cause of his injury—the inadequate warning of the overdraft fee procedures provided by [the credit union] in the opt-in notice."  *Id*. (citing *Whittington*, 2017 WL 6988193, at *13 ("If [the plaintiff] had exercised due diligence, she would have discovered her injuries either by viewing her online [] account or looking at her bank statements."));  *see also Harvey v. Google Inc.*, 2015 WL 9268125, at *4 (N.D. Cal. Dec. 21, 2015)

---

[7] *Domann* also rejected the plaintiff's contention that the federal discovery rule tolled the EFTA's statute of limitations. *Id*. at *10  (" I agree with other courts that have found that, with reasonable diligence, plaintiff could have discovered his injuries when he received his first overdraft charge either by viewing his online account or looking at his bank statement.").

[8] Although skeptical about the discovery doctrine's applicability under the EFTA, the *Tilley* court nonetheless accepted the plaintiff's argument under that theory, noting that it "need[ed] not decide whether the limitations provision of the EFTA incorporate[ed] the discovery rule because . . . even if it applies [to EFTA claims] it does not toll the statute of limitations in this case."  *Tilley*, 2018 WL 4600655, at *3 n.3.

(same).

The Court agrees with *Domann* and *Tilley*.  Beginning with the continuing violation doctrine, the Court notes that the Tenth Circuit has not extended this tolling device to Regulation E claims.  However, the Tenth Circuit applies this doctrine in other contexts (employment) only when the plaintiff's injuries result from multiple discrete acts.  *See Carroll v. Routh*, 812 F. App'x 770, 773 (10th Cir. 2020) (unpublished).[9]  Thus, like *Domann*, and assuming that the doctrine applies to EFTA violations, Plaintiff's Regulation E claim is time barred because only one discrete act serves as the basis for the Opt-In Rule violation.  To illustrate, Plaintiff alleges that Defendant violated the Opt-In Rule when it failed to "provide its customers with a valid description of the overdraft program[.]"  Compl. ¶ 77.  Thus, on January 21, 2019, the date Defendant first imposed an overdraft fee, *id*. ¶ 28, Plaintiff had a "complete and present cause of action," *Bay Area Laundry*, 522 U.S. 192, 195, 118 S. Ct. 542, 546, 139 L. Ed. 2d 553 (1997), based solely on Defendant's failure to provide her with a valid description of the overdraft program, i.e., the discrete act.  Or put another way, the overdraft fees assessed by Defendant after January 2019 were not discrete violations of Regulation E, rather they were the natural result of the allegedly infirm Opt-In Contract.  Accordingly, the continuing violation doctrine would not toll Plaintiff's claim.[10]

---

[9] *See Vasquez v. Davis*, 882 F.3d 1270, 1277 (10th Cir. 2018) (stating that "the continuing-violation 'doctrine is triggered by continuing unlawful acts but not by continuing damages from the initial violation'" (quoting *Colby v. Herrick*, 849 F.3d 1273, 1280 (10th Cir. 2017))); *Pike v. City of Mission*, 731 F.2d 655, 660 (10th Cir. 1984) ("[A] plaintiff may not use the continuing violation theory to challenge discrete actions that occurred outside the limitations period even though the impact of the acts continues to be felt."), overruled in part on other grounds as recognized by *Canfield v. Douglas Cty.*, 619 F. App'x 774 (10th Cir. 2015) (unpublished); *Loard v. Sorenson*, 561 F. App'x 703 (10th Cir. 2014) (unpublished) ("Any recent garnishment of [the prisoner's] income was not a new, discrete constitutional violation; rather, it was simply the natural result of the allegedly unconstitutional . . . restitution order.").
[10] This reasoning aligns with most district courts that have address this argument.  *See, e.g., Walbridge*, 299 F. Supp. 3d at 350 (overdraft fee); *Wheeler v. Native Commerce Studios, LLC*, 2018 WL 447716, at *1–*2 (W.D. Mich. Jan. 17, 2018) (unauthorized transfer); *Whittington*, 2017 WL 6988193, *2–*4 (overdraft fee) (citing and discussing cases); *Harvey*, 2015 WL 9268125, at *3–*4 (unauthorized transfer); *Repay v. Bank of America, N.A.*, 2013 WL 6224641, *4–*5 (N.D. Ill. Nov. 27, 2013) (recurring transfer).

Now turning to the discovery doctrine, which the Tenth Circuit also has not applied to EFTA claims, the outcome remains unchanged.  This device only tolls claims until "the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action."  *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994).  The facts as alleged in the Complaint do not make it plausible that Plaintiff had no reason to know that Defendant improperly assessed overdraft fees on her checking account.  For example, there are no allegations that Plaintiff could not obtain her statements or view her checking account balance.  Thus, it is not plausible that Plaintiff had no reason to know that Defendant assessed the overdraft fees based upon the available balance method.  *See Tilley*, 2018 WL 4600655, at *4; *see also Whittington*, 2017 WL 6988193, at * 13; *Harvey*, 2015 WL 9268125, at *4.

Neither the discovery rule nor the continuing discovery doctrine applies to these facts. Consequently, the EFTA's one-year limitations period bars Count V.[11]

   *2)  Safe Harbor*

The EFTA provides a safe harbor for

(1) any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Bureau or the Board or in conformity with any interpretation or approval by an official or employee of the Bureau of Consumer Financial Protection or the Federal Reserve System duly authorized by the Bureau or the Board to issue such interpretations or approvals under such procedures as the Bureau or the Board may prescribe therefor; or

(2) any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or the Board

---

[11] Plaintiff argues that dismissal based on timeliness is only appropriate where the time-bar is apparent based on the face of the complaint.  Resp. 22.  Plaintiff further asserts that she is under no obligation to plead specific dates to overcome a statute of limitations.  *Id*.  But Plaintiff actually pleaded specific dates that make the time-bar apparent based on the face of the complaint.

22

15 U.S.C. § 1693m(d)(1)–(2).  Defendant seeks refuge under both paragraphs because the Opt-In Contract mirrors Model Form A-9, the relevant model form prescribed by Regulation E.[12] Conversely, Plaintiff argues that "the weight of authority has held that use of a model form does not insulate a defendant from liability where, as here, the plaintiff is challenging the content rather than the form of the notice."  Resp. 21 (citing *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 265–66 (D. Mass. 2019); *Salls v. Digital Fed. Credit Union*, 349 F. Supp. 3d 81, 91 (D. Mass. 2018); *Gunter v. United Fed. Credit Union*, 2017 WL 4274196, at *3 (D. Nev. Sept. 25, 2017); *Pinkston-Poling,* 2017 WL 5153218, at *1).  Plaintiff's argument is unpersuasive.

Plaintiff's "content" theory and the cases that she relies on have already been rejected by *Tilley*, which this Court finds persuasive.[13]  According to *Tilley*, "[a]ny legal challenge to a disclosure made pursuant to Regulation E necessarily must contest the adequacy of the language used to make the disclosure. Thus, excluding challenges to the adequacy of the disclosure from the protection afforded by the safe harbor clause would render it superfluous and without effect." 2018 WL 4374076, at *5.  Specifically, the safe harbor "insulates a financial institution from liability for 'any failure to make disclosure in proper form' if the institution uses the appropriate model clause from Form A–9"—i.e., "if a financial institution uses model language provided by the Bureau to make a disclosure, it is shielded from liability for claims that the disclosure is deficient." *Id*.  The court reasoned that the form of the disclosure includes the substantive language from which it is constructed because "[i]n this context, the word 'form' refers to the 'particular . .

---

[12] Because § 1693m(d)(2) insulates Defendant from liability, the Court declines to discuss § 1693m(d)(1), the good faith provision.

[13] The *Tilly* court "respectfully disagree[d] with the *Pinkston-Poling* court's interpretation of the EFTA's safe harbor provision because it would render it a nullity."  The *Tilley* court also cited *Gunter* in reaching this conclusion.  For this reason, the Court need not discuss Plaintiff's other two cases, *Bettencourt* and S*alls*, which stand for the same proposition as *Pinkston-Poling*, i.e., that the safe harbor does not protect from a content challenge.

23

. structure[ ] or construction of a thing; the particular mode in which a thing exists or manifests itself.'" *Id*. (citation omitted).

This Court agrees.  If accepted, Plaintiff's attempt to distinguish between the form of the disclosure and its content would leave financial institutions that rely on Model Form A–9 falling through a trap door into a pool of liability.  Defendant is immunized from liability under the safe harbor because "the form of a disclosure includes the substantive language used to make the disclosure."  Holding otherwise would make the safe harbor completely illusory.  The Court will dismiss Count V with prejudice.

V.    **CONCLUSION**

IT IS ORDERED THAT

(1) DEFENDANT SANDIA LABORATORY FEDERAL CREDIT UNION'S MOTION TO DISMISS PLAINTIFF JENNY RADER'S COMPLAINT (Doc. 15) is GRANTED;

(2) Count I of the Complaint (Doc. 1) is DISMISSED WITH PREJUDICE;

(3) Count II of the Complaint is DISMISSED WITH PREJUDICE;

(4) Count III of the Complaint is DISMISSED WITH PREJUDICE;

(5) Count IV of the Complaint is DISMISSED WITH PREJUDICE; and

(6) Count V of the Complaint is DISMISSED WITH PREJUDICE.

SENIOR UNITED STATES DISTRICT JUDGE